CONTINENTAL BANK *v.* STUART.

FRAUDULENT CONVEYANCES—EVIDENCE—RECEIVERS.

> In suit by judgment creditor of defendant husband to set aside
> various conveyances by which title to his property became
> vested either in himself and wife as tenants by the entireties,
> in nonexistent persons, in business associates or relatives, evi-
> dence *held,* to justify finding such conveyances not *bona fide*
> and to have been made in fraud of creditors, although certain
> conveyances to family corporation are not set aside where re-
> ceiver for such corporation has been appointed with whom re-
> ceiver for husband may be able to work out rights of the
> various creditors including purchasers of lots from such cor-
> poration.

Appeal from Wayne; Webster (Arthur), J. Sub-
mitted June 16, 1937. (Docket No. 126, Calendar
No. 39,607.) Decided October 4, 1937.

Bill by Continental Bank against Alexander J.
Stuart and wife, S. Lillian Hall, Wanda VerPlaetse,
Jacob Soifer and wife and John Quick and wife to
set aside deeds, mortgages and assignments and to
clear title to real estate. Ben Jacobs and wife and
others, including Erwin T. Muir and Albert Mc-
Clatchey, coreceivers of the A. J. Stuart Land Com-
pany, a Michigan corporation, intervened as parties
defendant and filed cross-bills against defendants to
set aside conveyances and clear title to land. Decree
for plaintiff and cross-plaintiffs and intervening de-
fendants. Defendants Stuart appeal. Affirmed.

*Anthony Maiullo,* for plaintiff.

*Harry H. Wait,* for defendants.

*Albert McClatchey,* for intervening defendants
Jacobs, Higgins and Bailey.

*Howard H. Campbell,* for intervening defendants Hafner and others.

*Jorgensen & Alexander,* for intervening defendants, the co-receivers of A. J. Stuart Land Company.

CHANDLER, J. This cause in chancery was heard before the Hon. Arthur Webster in the Wayne county circuit who rendered an able opinion indicating a comprehensive understanding of the facts and issues involved.

After careful review of a lengthy record and consideration of the briefs of the respective parties, we find it difficult to relate more clearly or concisely the facts involved and the conclusions applicable thereto than has been done by the lower court, and we therefore adopt the opinion of the chancellor as the opinion of this court, omitting therefrom a small portion of introductory matter which is deemed unessential.

"The principal subject matter involved in this litigation is some 300 acres of land on the Detroit river in the township of Brownstown, known as the Stanton farm. Ever since 1916, when Alexander J. Stuart first acquired a land contract interest in this property, it has been the subject of almost constant litigation. It (the testimony) presents a picture of dealing and double-dealing with not only the Stanton farm but other properties. It is quite obvious that the court cannot, in the compass of any opinion of reasonable length, attempt to analyze in detail all the various charges of fraud that are involved in this litigation. No such attempt will be made. Rather, the court will content itself with what is at best a bare outline of such testimony as is necessary to indicate the reasons for the court's opinion.

"It appears that the Continental Bank is a judgment creditor of the defendant, Alexander J. Stuart,

having obtained a judgment of some sixty-odd thousand dollars. Execution was issued and has been returned unsatisfied, and the bank is seeking to set aside transfers of this so-called Stanton Farm as being in fraud of Alexander J. Stuart's creditors. A number of new parties have been permitted to intervene in this case and in the case of Wanda VerPlaetse v. The Continental Bank and others. By stipulation of counsel an order was entered consolidating all of these matters and permitting of a trial of all of the issues at one time.

"It appears that in June, 1918, Stanton and his wife deeded the so-called Stanton Farm to Alexander J. Stuart. In the year 1920 Stuart and his wife were residing on this farm. In October of 1920 Alexander J. Stuart became one of the incorporators of the Continental Bank of Detroit, being a subscriber to 40 shares of stock. Shortly afterward he became associated with the bank as a director and eventually was a vice-president, and within a year or so became quite a large borrower at the bank. In connection with these loans at the bank he furnished statements to the bank which have been received in evidence, and in these statements this Stanton Farm, together with other acreage in the vicinity, was listed by him as a valuable asset. One of these statements contains a listing of 400 acres on Lake Erie, valued at $200,000. Another statement lists 400 acres, one mile front on Detroit River, as $150,000. The Continental Bank became involved in difficulties, and the management of the bank was changed in 1924 or early in 1925. Mr. Stuart left the bank early in 1924, and on May 7, 1925, he reduced his obligations to the bank to approximately $48,000, giving a 90-day note which became due on August 5, 1925. The bank closed its doors May 25, 1925.

"We find in the chain of title of the Stanton Farm that in June, 1924, Alexander J. Stuart and Mary L. Stuart, his wife, gave a quitclaim deed to the A. J. Stuart Land Company, a Michigan corpora-

tion, this deed being recorded in August, 1924. Mr. Stuart executed this deed in behalf of his wife by reason of a power of attorney, which appears on the record. The Stuart Land Company had been duly incorporated about a year previous to the date of this deed. During all this time one Austin B. Chapman held a mortgage of $7,000 on the farm. This mortgage was recorded in August, 1918. In October, 1924, the Stuart Land Company, Austin B. Chapman joining with it, platted Rockwood-on-the-Lake Subdivision No. 1 and Rockwood-on-the-Lake Subdivision No. 2 out of a portion of this Stanton Farm. The plats in question cover over 200 lots.

"The Stuart Land Company was a family corporation, with Mr. Alexander J. Stuart holding all but a very few of the shares of stock. These lots were placed on the market through at least two different selling agents, and Mr. Stuart seems to have had a number of controversies with these selling agents as well as some of the purchasers of the lots. It appears, I believe, that altogether some 90 lots, or about 30 per cent of the lots platted, were sold to various purchasers.

"This brings us down to the summer of 1925. The $48,000 note Mr. Stuart had given the bank fell due on August 5, 1925. The abstract shows that on July 30, 1925, the A. J. Stuart Land Company gave a quitclaim deed to Margaret Reed conveying all of section 13 and all of private claim 636 lying east of the Peabody Road excepting lots previously deeded to Harry H. Wait (Mr. Stuart's attorney) and Ethel Tiffin. Margaret Reed was the stenographer in Mr. Wait's office, and this deed was given simply as a convenient method of transferring the property to Stuart and his wife, for on July 31, 1925, the next day, Margaret Reed gave a quitclaim deed of the same property to Alexander J. Stuart and Mary L. Stuart, his wife. It also appears that Alexander J. Stuart and Mary L. Stuart, his wife, on July 15, 1925, gave a quitclaim deed to Margaret

Reed of the easterly half of lot 4 in section 13, which was known as the John Quick Farm. This deed was recorded August 1, 1925, together with a quitclaim deed from Margaret Reed back to Alexander J. Stuart and Mary L. Stuart, his wife, this deed being dated July 31, 1925, and recorded the first of August.

"As bearing upon the intent with which these transfers of the so-called Stanton Farm were made from the Stuart Land Company to Margaret Reed and from Margaret Reed to Alexander J. Stuart and Mary L. Stuart, his wife, it is significant that right along in this period a great many other transfers of the same character were made by Stuart. The most valuable piece of property so transferred was lot 67 of the Governor and Judge's Plan, a piece of property which at one time was estimated by Mr. Stuart as being worth as high as $350,000. It appears from the record that on June 26, 1925, this lot 67 was deeded to Margaret Reed and by her deeded back to Stuart and his wife on the same date. Just before August 5, 1925, the date when this note to the Continental Bank became due, there are a large number of similar transfers covering, as far as the record discloses, practically all of the real estate belonging to Alexander J. Stuart. It would not be profitable to detail in this opinion all of these different transfers, but it is to be noted that one lot, namely No. 105 Rathbone Subdivision, which was actually held in the joint names of Alexander J. Stuart and Mary L. Stuart, was deeded to Margaret Reed July 15, 1925, and by her transferred to Alexander J. Stuart and wife.

"From all of these transfers it is quite apparent that within a very short period before August 5, 1925, Alexander J. Stuart was attempting to get his real estate in such a position that it would all be held by himself and wife by the entireties.

"The note Stuart gave the bank for $48,000 was not paid, and resulted in protracted litigation. Stuart claimed an offset for services, but this claim

was decided adversely to him, and resulted eventually in a judgment in favor of the bank for some sixty-odd thousand dollars. The bank as a judgment creditor now claims that these transfers of the Stanton Farm, so-called, just a few days previous to the due date of the bank note were made for the purpose of defrauding the bank and other credtiors.

"The only persons who are defending against this claim of the bank are Alexander J. Stuart and his wife, Mary L. Stuart, represented by Mr. Wait; and yet, strange as it may seem, it is the claim of Mr. and Mrs. Stuart that they have not owned this Stanton Farm since December of 1920; and they also claim that while the first deed given by them is not on record, they gave a quitclaim deed to the party to whom they originally sold the Stanton Farm in June, 1927, which quitclaim deed conveyed away all the interest that they had in the so-called Stanton Farm to S. Lillian Hill. This deed was recorded January 7, 1928.

"(It is to be noted that in dealing with these various transfers I refer to the land descriptions only in a general way. It would not be profitable, it seems to me, in this opinion to attempt to point out the discrepancies in the various descriptions, some of them covering less and some of them more, and in many instances descriptions in the same deed overlapping each other.)

"Taking up now for the moment the S. Lillian Hill claim of title to the Stanton Farm: This claim is not made by Mrs. Hill, who was brought into this litigation by publication and whose very existence is questioned by the plaintiff bank. It is really a claim made on her behalf by the Stuarts, and yet their counsel does not in any way represent S. Lillian Hill and claims never to have met the lady or had anything to do with her. Both Mr. and Mrs. Stuart testify that they were living on the farm in the summer of 1920, that during that summer S. Lillian Hill, a widow lady and a world traveler,

visited them for several months; she expressed a desire to purchase the farm, and apparently being quite well-to-do, was able to make the purchase for the sum of $25,000. Five thousand dollars was paid in cash, $7,000 represented the Chapman mortgage, and the balance of $13,000 was in some sort of way represented by some 18 or 19 thousand dollars of Liberty Bonds, which were then at a discount and were held by Mr. Stuart for the remaining $13,000 of the purchase price. The Stuarts claim that they gave a warranty deed, which was never put upon the record, and has never appeared in all this litigation. In view of their subsequent dealings with this very property, this testimony to me is quite incredible. Assuming for the moment, however, that it is true, then it follows that the Stuarts have parted with all interests in the subject matter of this litigation, and the query at once arises, why should they be permitted a rehearing of the case, with the expense attendant upon a retrial?

"Bearing in mind that the Stuarts claim to have parted with all interest in this Stanton Farm, leaving S. Lillian Hill as the sole owner, it is difficult to understand why they should join in a deed to the A. J. Stuart Land Company (a family corporation, although a few closer friends purchased a few shares of the A. J. Stuart Land Company), and why the A. J. Stuart Land Company should attempt to plat Mrs. Hill's property without her consent and proceed to sell lots to trusting purchasers, when all the time the Stuarts knew that Mrs. Hill was in a position to repudiate the entire transaction. I cannot believe that there was any *bona fide* transfer of this property to S. Lillian Hill back in 1920.

"It seems to me that in view of the bank obligation maturing in early August, 1925, the transfers from the Stuart Land Company through Margaret Reed back to Alexander J. Stuart and Mary L. Stuart, his wife (constituting an estate by the entireties) were a very evident attempt to put this

property beyónd the reach of the individual creditors of Alexander J. Stuart, and as such were fraudulent transfers.

"But on January 7, 1928, there is recorded a quit-claim deed from Alexander J. Stuart and wife to S. Lillian Hill, which had been executed on June 8, 1927. This deed covers the Stanton Farm and the John Quick Farm except certain lots, and also the Navarre Farm and a lot of other acreage in Brownstown township. On the face of this deed Stuart and his wife parted with all possible interest of any kind which they may have had in the property described in this deed to S. Lillian Hill. Again the query arises, why should these parties be so actively defending the present suits if they have made a *bona fide* sale to S. Lillian Hill? To me it is quite apparent that if there is such a person as S. Lillian Hill, then these various deeds to her cannot be upheld as good faith transactions. I say this because, although there has been protracted litigation for upwards of 10 years involving this Stanton Farm, no person identified as Mrs. Hill has ever at any stage of the litigation appeared in person or by attorney; and more convincing still, several deeds purporting to be deeds executed by S. Lillian Hill herself have been received in evidence. Perhaps these deeds should be referred to as photostatic copies of the original deed. The signature on these deeds appears to the untrained eye to be identical with the handwriting of Alexander J. Stuart, and Mr. Courtney, a reputable handwriting expert in the city of Detroit, has compared the signature 'S. Lillian Hill' on these three deeds with the admitted handwriting of Alexander J. Stuart, and pronounces the writing to be all that of one and the same person. Mr. Stuart's answer is a denial, but his testimony along this line is not very convincing, first, because no serious attempt to cross-examine the handwriting expert was made by his attorney, no other expert was produced

on behalf of Mr. Stuart's claim, and in addition, the court expressly challenged Mr. Wait's attention to this situation during the trial and suggested that although Margaret Reed, the stenographer, was dead, there were at least two other witnesses to these deeds who might be produced, namely, Arthur S. Hall, a grandson of the Stuarts, and Mary C. Malvin, a domestic formerly in the service of the Stuarts.

"In discussing this phase at the close of the case, the question was asked of Mr. Stuart's counsel, 'Must it not be assumed that Mr. Stuart was signing the name S. Lillian Hill to these documents? How could a court find otherwise in the light of that testimony, without an explanation after it is challenged?' And Mr. Wait replies, 'I think your honor would be justified in so finding.'

"In my opinion, then, whether S. Lillian Hill is a myth or whether such a person as S. Lillian Hill really lives, the court must say that these various transactions with S. Lillian Hill are obviously not *bona fide* transactions, and the decree should set them aside as in fraud of the creditors of Alexander J. Stuart.

"But having reached this conclusion, we have unraveled only one section of this 'cross-word puzzle.' The quitclaim deed above referred to, running to S. Lillian Hill, was recorded January 7, 1928. In May, 1928, we find on the record a sheriff's deed to Jacob Soifer. This deed was given pursuant to a purported foreclosure of the old Austin B. Chapman mortgage for $7,000, made in 1918 and running for a period of three years. This mortgage for $7,000 was but little more than the sale price of some single lots in the subdivision, and it seems strange that it should have been kept alive so long. On the face of this record Soifer received an assignment of this mortgage from Chapman and proceeded to foreclose it, and bid it in at the foreclosure sale, which was

had by advertisement instead of through the chancery court. Just a year later, in June, 1929, there appears on record a quitclaim deed from Soifer and his wife to one Albert H. Sweet, and following this a deed recorded in March, 1931, from Albert H. Sweet to Wanda VerPlaetse; and this was in turn followed by a deed from Wanda VerPlaetse to May Koenig. If this chain of title could be sustained, then on its face it relates back to a mortgage given in 1918, and would wipe out all interest of the Stuarts and S. Lillian Hill, and in addition might wipe out the interest of the lot purchasers in the Rockwood subdivision. But a careful analysis of the testimony relating to this particular chain of title has developed so many incredible business transactions as to make it evident that this is in turn a mere subterfuge of the defendant, Alexander J. Stuart. Here again, it is not possible within the limits of this opinion to examine all the ramifications of this chain of title. Mr. Soifer himself was a witness not only at the original hearing, but upon the rehearing. His testimony is to the effect that he took the assignment of this Chapman mortgage as an accommodation for Mr. Stuart. The foreclosure was carried on in his name, and he bid in the property at the behest of Mr. Stuart. He testified that he had never seen the property, and yet there is an affidavit on record that he posted a notice of the foreclosure sale on this very property. He testified that he did not know Albert H. Sweet and that the deed from himself to Albert H. Sweet was handled by Mr. Stuart and it is significant that one witness to this deed is Harry Selzer, the father-in-law of Mr. Soifer, while the other witness is Frances M. Frank, a relative of Mr. Stuart. The original deed was placed on record and a photostatic copy of the record has been received in evidence, but in addition, Mr. Soifer produced his copy of the deed which he himself kept. This copy is acknowledged before Harry

Selzer and witnessed by Harry Selzer, but does not have the name of the second witness, Frances M. Frank, upon it. My recollection is that this deed to Albert H. Sweet was returned from the register of deeds office by mail to Norman Frank, 1044 Alter Road, who married a granddaughter of Alexander J. Stuart. As stated, this deed was recorded on June 4, 1929; and on October 7, 1929, Albert H. Sweet, by A. J. Stuart, his attorney in fact, leased the hunting privileges on the so-called Stanton farm to Ray L. Spitzley for a period of five years at $500 per annum. Mr. Stuart claimed upon the stand that he did not know Mr. Sweet personally, and as I recall, claimed that his authority came through a mysterious Mr. Smith. In his correspondence, however, which is in evidence here, it is quite apparent that he deals with this farm as if it were his own. He talks about the necessity for getting money from Mr. Spitzley, claiming that he himself and not the owner is hard up and needs the money. These various transactions with Mr. Spitzley, who had the hunting privileges, and with the man who had the fishing rights, are all indicative of personal dealings by a man claiming the ownership of property, rather than an agent acting for the owner. It is true that in places he speaks of his agency, but this cloak is quite often dropped. Albert H. Sweet never appeared as a witness, although I believe there is an affidavit purporting to be from a person by the name of Albert H. Sweet on file in one of the cases.

"Wanda VerPlaetse came into the picture in the fall of 1930, her deed being recorded March 31, 1931. She appeared as a witness at the former hearing, but did not return for a continuation of her cross-examination, and has not as far as I know appeared in this jurisdiction since. Her testimony at the first hearing had been transcribed by the stenographer and was received at this rehearing by stipulation of counsel. Her story of the manner in

which she acquired title to this valuable property is difficult to believe. To begin with, according to her own testimony she is a woman with limited experience in real estate matters and of rather limited means. She claims to have known Mr. Sweet, and without knowing anything about the property, without making any attempt to see it, without getting an abstract to know anything about the title, she gave him some eight or nine thousand dollars in cash. There are no checks or cashier's checks or any documents which could in any way enable us to trace the money end of this transaction. She claimed that she had this money in a safe in her house. She apparently made this purchase with some sort of an understanding that Mr. Sweet would purchase it back at an advance, but when examined on this feature she was quite hazy about just how much of an advance she was to get or what the transaction really meant. She testified that after obtaining this deed she came here and paid some taxes and put the deed on record. It is to be noted that it is a quit-claim deed. When she came here to Detroit she claims that she never registered at a hotel, and finally made her payment of taxes to the county treasurer in the county building. These records, on being produced, indicate a payment not for the property described in the deed itself, but for a number of lots. These payments purport to have been made in the name of Wanda VerPlaetse, but the address of Wanda VerPlaetse on the treasurer's records shows as 710 Virginia Park, which at that time was the residence of Alexander J. Stuart and his wife. This deed to Wanda VerPlaetse, according to the record of the register of deeds office, was picked up by Stanley J. Hall, a grandson of Alexander J. Stuart. Mr. Stuart, after this transfer to Wanda VerPlaetse, begins to use the name Wanda VerPlaetse, and as her agent made a lease to Charles P. Newberry for the hunting privileges on the Stanton farm. This

lease is undated, and appears to have been assigned by Newberry to Ray L. Spitzley. In October, 1931, he addresses a communication to Mr. Spitzley notifying him that this lease was canceled, and signs himself, 'A. J. Stuart, agent for Wanda VerPlaetse.' Then on the first of October, 1931, there is a blank lease executed by A. J. Stuart, reciting A. J. Stuart as agent for Wanda VerPlaetse and Ray L. Spitzley as party of the second part, which was sent to Mr. Spitzley but which he did not execute. October 12, 1931, Mr. Wait as attorney for A. J. Stuart, agent for Wanda VerPlaetse, asked Mr. Spitzley for $300 balance due for shooting, etc. A check September 1, 1931, for $100, made to C. P. Newberry and A. J. Stuart, agent for Wanda VerPlaetse, was received in evidence, and this check apparently became involved in a controversy with Mr. Newberry, and Mr. Stuart makes an affidavit dated October 30, 1931, that this signature on the check is a forgery.

"All of these things and many more indicate Mr. Stuart's very close connection with Wanda VerPlaetse, the third grantee in this chain of title founded on the foreclosure of the mortgage. Now, strange as it may seem, Wanda VerPlaetse denied ever knowing or having seen Mr. Stuart, and Mr. Stuart himself denied ever knowing Wanda VerPlaetse. This phase of the case needs a lot of explanation, in view of the records of the county treasurer's office showing a payment of taxes with Wanda VerPlaetse's residence given as that of A. J. Stuart.

"The last grantee in this chain of title is one May Koenig, who received a quitclaim deed dated March 1, 1933, from Wanda VerPlaetse, the deed being recorded on March 22, 1933. At this trial, by stipulation of counsel, we have the transcript of the testimony of Wanda VerPlaetse as to this transaction, but no testimony from the Koenigs. In this connection it should be borne in mind that a suit was instituted in the name of Wanda VerPlaetse and May

Koenig by Mr. Fred A. Lehmann as their attorney. This suit sought to reform the Soifer sheriff's deed so as to include more land than was covered by the Soifer deed. It also sought an injunction to restrain the Continental Bank and the receiver for Mr. Stuart from taking possession of the property. Mr. Lehmann was very active in behalf of his clients in the trial of this case at the former hearing up to the time that one of them, Wanda VerPlaetse, in the midst of her examination took the train for New York City, and refused to return to this jurisdiction. He made a statement upon the record at the beginning of this trial, and throughout the trial there has been no appearance by any of the Koenigs to press any alleged claims they may have to the property in question. With this transcript of the testimony of Wanda VerPlaetse we have the only explanation at this trial regarding the deed to May Koenig. This explanation of hers is to me quite incredible. She claims that Mr. Sweet not having repurchased the property, she advertised it in a Detroit paper for sale. She could not recall the name of the paper. It is her claim that in response to this advertisement she got into communication with the Koenigs, and finally came to Detroit in the middle or latter part of March, 1933, bringing with her a quitclaim deed which had been executed by her before a notary public in the state of New York. It is her claim that this notary drew up the deed for her on March 16, 1933, and she brought it with her. The photostatic copy of the deed shows that it was drawn on a Richmond & Backus legal blank bearing the name of that company, located at Detroit, Michigan. When she came to Detroit to consummate this deal the Koenigs were actually in possession of the property, and had been there for some time. Just how or why, it is difficult to understand. She testifies that she did not register at a hotel, but went directly out to the farm, going by bus and then walking across country for a mile or so. At the farm

the deal was consummated by a transfer of some $9,000 in cash and a note for $12,000, the note, however, not being secured by a mortgage upon the property. Why people of the type of the Koenigs should have $9,000 in cash lying around loose is not explained, and it is difficult to understand why in this transfer, just as in the transfer by which Wanda VerPlaetse acquired her interest, there should not be a check, voucher, receipt or anything of the kind in connection with the payment of such a large sum of money. The story of Wanda VerPlaetse required a great many different explanations, and certainly her sudden departure for New York did not aid the court in clearing up a number of matters in connection with this last transfer. At the present hearing the Koenigs have not seen fit to appear or press their claims, although if this story of Wanda VerPlaetse is to be believed they parted with $9,000 in cash. Perhaps the explanation of their failure to appear at this time is to be found in the additional fact that a daughter of the Koenigs married a grandson of the Stuarts.

"A review of the testimony relating to the chain of title established by the purported foreclosure of the Austin B. Chapman mortgage leads me irresistibly to the conclusion that the testimony of Mr. Soifer should be believed as against that of Mr. Stuart. According to Mr. Soifer's version of this transaction, he accepted the assignment of this mortgage as an accommodation to Mr. Stuart, and under all the circumstances disclosed by this record I am of the opinion that this should be held to amount to an extinguishment of the Chapman mortgage. It is very evident that Stuart got the assignment into his hands for the very purpose of complicating the record title in order to prevent his creditors from realizing anything out of the Stanton farm. This chain of title began in a fraudulent intent, and there has been no *bona fide* transaction connected with this chain of title down to the present

time. All of the transfers beginning with the sheriff's deed should be set aside.

"To summarize: I am of the opinion that the transfers of the Stanton farm made to S. Lillian Hill (whether such a person is in existence or not) were made for the express purpose of hindering, delaying and defrauding the creditors of Alexander J. Stuart, and must be set aside. As I have already said, the decree should also provide for the same disposition of all transfers in the chain of title beginning with the sheriff's deed on foreclosure.

"It appears that on June 2, 1924, the defendant Alexander J. Stuart was the owner of this so-called Stanton farm. It is true that on that date he had obligations at the bank, but from the record it does not appear that he was not in a position to meet these obligations. He could undoubtedly have paid his bank obligations in full from other sources aside from this Stanton farm. He transferred the Stanton farm to the A. J. Stuart Land Company (Mrs. Stuart joining in this transfer). The A. J. Stuart Land Company, however, was a family corporation in which Mr. Stuart himself held all but the necessary qualifying shares. Now, I have not overlooked the fact that subsequently a few shares were distributed to close friends, but later they all came back to Mr. Stuart himself. This transfer was not a transfer away from Alexander J. Stuart, and could not be held to be in fraud of creditors, because it simply left the property in the hands of Mr. Stuart in the form of shares of stock in a corporation. At the time of this transfer in June of 1924, apparently the defendant Stuart did not have in mind a transfer of his properties so as to hold them by the entireties. In my opinion, then, this transfer of June 2, 1924, to the A. J. Stuart Land Company must be held to be a valid transfer, because there is no showing that it was made for the purpose of hindering, delaying or defrauding creditors. On the other hand, the attempted transfer out of the A. J. Stuart Land

Company through Margaret Reed to Stuart and his wife is clearly an attempt on his part to place his property beyond the reach of creditors, and for that reason must be set aside.

"There is a receiver for the land company, as well as a receiver for Mr. Stuart personally, and with a final decree placing this property in the A. J. Stuart Land Company it ought to be possible to adjust and work out the rights of the various creditors, including the lot purchasers."

It is obvious from the facts found by the trial court that the law controlling this case is elementary and no citation of authority is deemed necessary.

Decree affirmed, with costs.

FEAD, C. J., and NORTH, WIEST, BUTZEL, SHARPE, and POTTER, JJ., concurred. BUSHNELL, J., did not sit.